House. Good morning, Your Honor. My name is Serge Stoney from Stoney Law Firm. I represent the appellant today, Milton H. Greene Archives. Your Honor, we're here today because the Court failed its important gatekeeper function, resulting in a trial, a surprise and ambush, denials of due process, improper legal standards, and confusion of the jury. If the Court had applied the litigation safeguards that the Federal rules instruct and were designed to create a level playing field, we would have had a completely different trial. What we had instead is witnesses who had never been identified testifying to subject matters that they were not qualified to testify, and witnesses testifying contrary to what they had indicated in their depositions that they had knowledge about. We had hearsay documents being presented out of sequence and for wholly speculative purposes. And we had a party which had chosen to completely flaunt the litigation process by failing to provide any discovery at the 11th hour, permitted to testify, and with us not having had the opportunity to conduct all the appropriate discovery there. You know, you're going to have to be a little more specific because I'm finding it hard to attach these generalities to the claims that are made. I understand. Because we really have two different issues here. One's a motion for a new trial, which is in front of us, and the second is the appeal from the post-judgment orders. So we need you to focus in on those issues. Certainly, Your Honor. Here's what we have in the case. And if we address the facts, perhaps it will help us focus on those issues. Well, what argument are you? Are you speaking now first to your argument that the jury verdict? Yes. Because it sounds to me like everything you just said was an attack on what the judge did. But are you arguing the weight of evidence argument? Yes. I'm arguing about the weight of the evidence, the jury instructions, and the jury verdict. One at a time. Explain to me how the jury's verdict was against the weight of the evidence. Certainly. Let's address Barclays. Barclays is a furniture store that chose to participate with Julian's auction in setting up the function. They had an agreement in which they agreed to work together. Barclays had veto power with respect to something they were going to receive, some benefits out of this transaction. And the evidence uncontrovertedly established that Barclays did this for promotional purposes, to enhance its presence, to draw additional customers. And its own internal documents demonstrated that they believed that this investment of $20,000 and the provisional space and support for Julian's auction would result in a $200,000-plus value and benefit. Was there any evidence that Barclays actually would profit from the auction? No, there isn't any evidence that Barclays actually received a specific monetary profit as a result of the auction. No evidence that any sale was brought to Barclays? Right. None that we could establish. Again, we have a vacuum because Barclays chose not to respond to discovery, did not produce any documents, did not appear for deposition, and was precluded by the Court from testifying or producing any evidence at trial. The Court then vacated that order when new counsel came in and directed that we be allowed to take the deposition of Mr. Barclays. On the eve of trial, at this late date, without having had the opportunity to have adequate document production, adequate investigation, adequate cross-examination, adequate follow-up discovery, we were at trial with basically nothing other than Mr. Barclays' deterrent contention that he earned no profits. There was no way for us to prove otherwise. That's the ambush. That's the inappropriateness of allowing that to occur. Had the Court stuck with the original ruling, which was consistent with the Federal Rules of Evidence, which is appropriate under the circumstances when a party fails and refuses to participate in discovery, we would not have had that situation. Here's the evidence we have as to Barclays' involvement in the infringing conducts. There's no contest. In fact, there's a judgment that Barclays used one photograph, the cover photograph, on the catalog. Correct. Only one of the images, Barclay used. In two different newspaper ads. Now, we also know that there's no evidence of what Barclay made on that image. No. And there's no evidence that a sale could drop to Barclays at all, even by the auction. That is correct. But what we do know is that. . . So how is that against the jury's weight of the evidence of the jury's verdict that Barclays get no damages? Well, the Ninth Circuit has recognized in the Uhal v. Jarkran case that where a party is engaged in promotional advertising or institutional advertising, that it is appropriate to infer that they sought to obtain and did obtain a value equal to its investment in the advertising. In this case, Barclays invested no less than $20,000 in cash, plus the provision of its facilities, plus the support of its people. It was appropriate for the court to have instructed, allowed us to include the instructions, that Barclays sought that level of recovery and benefit at a minimum. Instead, what the court did is required the jury to find and required the plaintiff to prove that there was a specific, direct, quantifiable, monetary benefit in order to make a recovery. And that is simply not the law. It is sufficient for us to establish that we suffered a damage and they suffered a benefit. That is supported by the evidence, uncontroverted evidence. They paid $20,000. They expected $200,000 in benefit. They admit that. It's also my understanding from reading the record that your client never even sought to secure a license fee from Barclays prior to trial. That is correct. What my client did is notify Barclays when he was informed of the advertisement that this is an infringing use. He was directed to Julian's. But you never sought even a license fee from them. You never said, give me anything. A copyright owner is not obliged to offer a license for an unauthorized use. Well, I understand that.  The jury said nothing for Barclays. So I looked at, well, how many images did they use? One. They paid to be a sponsor. I got no evidence that they made anything on the image. And I got no evidence that they made anything on the auction. And you never even sought a license fee from them for the use. And I'm supposed to take those facts and say it's against the weight of the evidence that the jury said zero. Yes, Your Honor. And let me explain why I believe so. This, we do not have a system that requires a copyright owner to extend a license to an infringer who has chosen to use without authority. The problem here, though, is on the facts. Mr. Green, he had in his own declaration that he said, you know, let's talk about you paying for this. He even used the word license, although he pretended not to know what it meant later on in trial. But he did say, let's talk about a license agreement. He said that before the auction. So you're right. You know, a proprietor of copyright can hold on to it like any other property and let no one use it if he wants to. But that's not what happened here. There was a discussion about a license. There was. And this is what happened. Mr. Green discovered the auction through an advertisement by Barclays. His staff contacted Barclays and said your use of these images is an infringement. They were directed to Julian's to resolve the issue. With Mr. Julian, he engaged in settlement discussions. He said, let's get this resolved so you can proceed. Here's what I'm willing to take on. You are characterizing that in settlement discussions now? I'm sorry? You are. You characterized it both to the court below and to us now and in your briefing as a settlement discussion. It absolutely was a settlement. No. I mean, it doesn't necessarily have to be described as a settlement. They had the conversation before the auction took place. But after use had begun. Right. But it doesn't necessarily mean that there was a settlement discussion. There was no action pending. Your Honor, a license is a permission. A license is not a settlement. And they were talking about a license. They were talking about a payment of money to resolve a claim of infringement. You can characterize it like that now, but we're talking about two non-lawyers talking about a license, which is a routine thing in the field of intellectual property. Here's what the testimony was. Mr. Green said, I called Mr. Julian. I said, those are our pictures. You should not be using it. You don't have permission to do so. Mr. Julian said, oops, didn't know that. What do we have to do here? Mr. Green says, I'm prepared to resolve this matter with you by payment of $17,000. Now, they did use the word license in context, but it doesn't change the fact that this was a post-infringement attempt to resolve a charge of infringement to resolve a case in anticipation of the filing of a lawsuit. It is absolutely positively, without doubt, a discussion that was in the context of a settlement. That's what happened. He was directed by Barclay Gutera to go talk to Julian to resolve it. His discussions with Julian would have resolved it for both parties. He did, in fact, make that effort. Now, they chose instead not to settle with him. They chose instead to proceed with the auction, continue to use the catalogs, continue to advertise, continue to display those images. They did that with knowledge of the claim of infringement. It was not ignorant. It was not innocent. It was not accidental, and it was not coincidental. It was directed conduct by them. They then held the auction. Barclays did it for the benefit of obtaining an increased draw of customers to its store, to increase its prestige, to associate itself with Marilyn Monroe. They paid for the privilege, and they had a recognized benefit that they themselves admitted that they were going to receive from the conduct. That constitutes a benefit. We submit that satisfies the standard required to go to the jury. But the judge instructed, you cannot find that there was a profit earned unless it was direct, it was quantifiable, it was non-speculative, and it was monetary as a benefit. Now, applying that standard, common sense would tell a jury, well, they didn't receive a check. There was no money that crossed the table, and therefore they didn't receive a benefit. That's wrong. That's not the standard of the law. The law applies in pure international, in the full and decent cases, and all of the Ninth Circuit's authority recognizes, without a doubt, we must show that there's a causal connection between the benefit and the infringing conduct. There clearly is. They advertised the cover of the catalog, the infringing image. They displayed all eight images for a week prior to the auction and at the auction. They did so at the authority of Barclay Butera, pursuant to their premises and their supervision, under their control, and that satisfies all of the prongs to establish both direct infringement and, alternatively, inducement and contribution. But the judge refused to instruct the jury as to inducement or contribution. The judge refused to give any guidance to the jury about that conduct. Given the confusion that resulted from a mere notion of vicarious infringement for which the jury, as laypersons, don't have a foundation or connection, the words inducement and contribution would have had greater meaning, and they should have been guided with jury instructions. Barclays did not receive nothing by their conduct. They received exactly what they sought. They received the public recognition. They received presence in the press. They received press releases. They received the opportunity to advertise. They received their appearance in the catalog. They received over 300 bidders who came to their premises, saw their facilities, may have purchased other goods. We don't know, and why don't we know? Because Barclay Butera refused to participate in discovery. That's why we don't know. Were we ambushed at trial? Absolutely we were ambushed at trial. Were we entitled to have had that discovery prior to trial? Yes. Were we entitled to have an expedient trial from testifying? That was the order of the court. There was nothing that had changed which justified a change in that ruling. There was a change in counsel, but we had, off record, in the pretrial conscience order, admissions and agreement that superseded the complaint. They acknowledged that there was an infringement of all eight images. You want to talk about Barclays for all your time? I mean, you're under five minutes left. No, Your Honor. Let me turn to, because Barclays is only one part of this. You're absolutely right. I was trying to address the court's consensus. The problem we have with Julian's is also the problem of the standard applied for proof of profits. Without a doubt, a jury had a right. Are we looking then at the jury instruction? Yes. Which one? I believe it's 3G. 3G? I believe so, Your Honor. Counsel, this is Judge Rawlinson with a question. Did you object to the formulation of instruction 3G at trial? Vigorously and repeatedly. Almost at the point of being sanctioned. Why is that in the record, your specific objection to the formulation of 3G? I can submit it after our argument. I can't pinpoint it at this moment. Well, don't submit anything for me unless I ask. I'm asking you now. Of course. Unfortunately, I don't have the specific record cite for you at this moment. I would be happy to provide it if your court requires. Your Honor, with respect to Julian's. So we're really talking about instruction 3G? I believe that's the one, Your Honor. That's 3A. I mean, you object. As I understood it, you wanted to add to 3A. But you wanted to add stuff that wasn't in the complaint. Or supported by the evidence. That's what the court found. 3A was the definition for impeachment and contribution. We submit that the complaint placed them on notice of infringement. I understand what you're suggesting. I'm just saying I'm trying to get you to 3G. I'm trying to make sure we're focusing in on the right instruction. I believe it is 3B. My mistake, Your Honor. 3B? Yes. 3B related to the question of the draw. Clarifying instruction was not inconsistent with whether a draw is sufficient. And 3G. 3G was misleading instruction. Well, I understand on 3G. But 3B, you catch me by surprise. I didn't even know you appealed 3B. No. We did appeal 3G. The argument of the defendants was that 3G was not in error because it incorporated 3B. And our response is 3G is the one that we're concerned about. It is in error. And the incorporation did not cure the response to the jury question by the court. You know, you have a little over a minute left. Are you going to address the attorney's fee issue? The only thing I would address now, Your Honor, is with respect to the attorney's fees appeal. Without a doubt, what the district court did here was use a meat cleaver. While it may be expeditious to do so, it is not an approved tool for resolving an attorney's fees motion. That sounds pretty good if you're in front of the jury. But now you're on appeal. Tell us what you said. Meat cleaver doesn't say anything. We're here on what is the standard review here? Standard review is abuse of discretion. That is correct. And now we're looking at what the district court did. So what meat cleaver quote, unquote, tool was an abuse of discretion. What part of all that they did was an abuse? What the district court did was apply a 55 percent reduction of the fee claim. Yes. It's an arbitrary number. It is not the manner in which this Court has declared a determination or evaluation of a fee claim should be done. This Court. Just because it says 55 doesn't mean that that would be bad if the district court didn't say why they did it. But as I understood, the district court laid out the factors. They made detailed findings. They explained the reasonings. I guess I'm trying to figure out after going through all of that, if you say, and based on all of this, I say it's 55, you've given the justification for abuse of discretion. Your Honor, the Moreo case says you don't do a percentage reduction. You're supposed to go through the specific requests for fees, the specific basis of the objections for those fees, and to make appropriate reductions or adjustments where you find those objections are warranted. That's not what he did. In fact, he explicitly said, I'm not going to do that. I'm not going to bother going through this line by line, item by item, objection by objection. I just deem 55 percent reduction as appropriate. That's incorrect on the Moreno and the instructions of this Court. My time has expired. Thank you. Good morning, Your Honor. Jill Petrain for Attorney. I'm going to use 11 minutes to split it up between the three of us because Mr. McClellan represents Butera and will address most of the issues relating to Butera and my partner, Mr. Mallon, will use four minutes for the attorneys' fees issues. I'd like to address, I wasn't quite sure which direction we were going to go until Mr. Stoney got up, but I'd like to address a couple points. One is the, that Mr. Stoney raised. One was the settlement discussions. I don't think those were settlement discussions at all. I agree with you, Your Honor, that this was a business communication as to a license. And a case that directly goes to that is Big O Tire v. Goodyear, 561F2nd, 1365, page 1372, Tenth Circuit, 1977. The discussions in that case related to, again, a license. It was a use of a trademark. They were three months before the lawsuit was filed, and the district court said, or the Tenth Circuit said that is not a settlement discussion. It was a business communication. And the same was here. It definitely was a discussion of business terms of license. There was no discussion of you were going to sue. All the evidence at trial was discussing a license. And that is supported by the declaration. There are two declarations in record of Mr. Green. One was the original declaration that was used by Peteris Counsel in cross-examination when Mr. Green played the word game as to what license meant. And then another declaration was the amended declaration of Mr. Green in support of the motion for summary judgment that was also of record in the case. In that case in particular, he attached copies of letters going back and forth with Mr. Julian as to what a license fee might be. So I definitely do not agree that that was a settlement discussion, that any motion that was made by Mr. Green or Mr. McClellan was violated as to that issue. In terms of the weight of the evidence, Mr. Sony didn't really address that as to Julian. As to the Butera defendant, Mr. McClellan will address that. But one point I just want to put out there, that Butera was, in fact, deposed right before trial. It was December 26, 2006, or the 27th. He did have a deposition. So he had the benefit of that testimony. There was no unfair surprise, no ambush. This whole thing, I think Mr. Sony was referring to Ms. Wooley's testimony initially when we got up to the stand. But she, again, there was no surprise on her. She was deposed. She was her deposition was part of the record in opposition to the motion for a new trial. She was asked what her title was. She had operating officers, which she said. She talked about her work at doing appraisals. She talked about the factors that people consider when they purchase memorabilia, particularly at auction, and went into talking a lot about the provenance being the most important thing and where the item, what the item was, was it a unique or a rare thing. There was certainly no ambush by Ms. Wooley's testimony. Another point that was raised by Ms. ---- in the appeal briefs was that Ms. Wooley was testifying as an expert. I was going to ask, how are you going to respond to that? Pardon me? How are you going to respond to that? Well, two things. One, no objection. There was one objection raised by Mr. Sony during her testimony. It was at the beginning of her examination when she was talking about what she'd done. It was background. I've done this type of work. I have a speaking engagement. That was it. Mr. Sony objected and said that, look, this is going into expert testimony, and Judge Matt said that won't happen. Don't worry about it. No further questions were asked about her appraising. There was no objection made on expert testimony. The rest of it was either foundation or relevance. And her testimony as to the factors and what people consider, and this goes to apportionment, is that she ---- this is what she does for a living. She goes to these auctions. She goes to people's houses. She sees what people do. At one point she testified, hey, look, you know, if something's in really good condition, sometimes people try on the clothes. It may be a little creepy, but that's what they do. And she sees that they do that. And that's the things that factor in. So you're suggesting her testimony at any ---- in any event was lay testimony based on what she does in a general way? Absolutely. She gave no expert testimony as to what this particular situation would be. No, she did not. In terms of the ---- there was an issue as to Exhibit 10 that was raised, and they made a point in their brief ---- in their appeal brief as to that. Exhibit 10 was a deposition marked in Ms. Woolley's deposition by Mr. Stoney and used. So there was no unfair surprise. They knew we were going to use that exhibit. That exhibit was direct rebuttal to a reading of Margaret Barrett's deposition where she said something to the effect that I don't know what happened to the books that I had of Meryl Monroe. And Exhibit 10 was an e-mail from Margaret Barrett to Laura Woolley that said, can you have my books back? Make sure you send them back, all 23 of them. So there was no unfair surprise on that, and certainly not as to the chart that all Ms. Woolley did was add up some numbers of exhibits that were already admitted into the case. She didn't testify as to that. In terms of the jury instruction for the standard of proof of prophecy, I'm not really sure what jury instruction we're talking about. I looked at this while the appellant's argument was going on. I think it may have been 3B, which is optional damages that he's referring to, but I'm not sure. Our position is if the argument has not been sufficiently briefed and presented in any detail to the court, then it would be waived, because I can't follow what it is that we're complaining about on that assessment. He's talking about the standard of vicarious liability, possibly direct and objective financial benefit. I don't know. That's instruction 3G. Okay. Mr. McClellan will address that with respect to Buter. And certainly, as he will tell you, there is Ninth Circuit law that supports the position of the district court on that jury instruction. The last issue before I turn it over to Mr. McClellan is actually two issues, actually. One is the wilfulness standard and reckless disregard. That is not the law of the Ninth Circuit. The case that Mr. Soney relies upon to say that it is, is the – I think it's the Safeco case from the U.S. Supreme Court. That was a different set of facts. That was a fair credit reporting act. And one thing that the Supreme Court said, and this is on page 22. Well, we're really looking at instruction 3F now. And I guess in the context of copyright infringement, there is no case which would suggest that willful and reckless disregard. Correct? That's correct. Well, willful, at least in the statutory damages section of the Copyright Act and Copyright It would be other contexts in which willfulness is used in the different levels of attempt. But what you're talking about here, aren't you, is the district court's interpretation of it in the context of whether or not they were entitled to statutory damages. Right. It's whether – well, what they were saying was the whole context is what's the burden of proof on willfulness? Is it a knowing violation that you know that it's copyright infringement and you'll proceed, or was it a reckless disregard? And the Ninth Circuit in the Peer, the Peer case, doesn't say that it's reckless disregard. The plaintiff cited all these cases from other jurisdictions, but that's not the law of the land here. The Safeco case, the reason why they found reckless disregard was sufficient in that case because it was a matter of statutory construction. There were two pieces to the statute. And the way the first part of the statute lent itself to the common law interpretation of reckless disregard. The second part of the statute was really more of a knowing violation. And it used those words. And the Supreme Court said, look, you know, that is a different standard on this, and we can't ignore the statute in this case. Not only that, but it's a civil case, yes, but if we took that to interpret all civil cases, then the Supreme Court would have been saying every Federal civil statute automatically has a reckless disregard standard. And there's no way. It just doesn't exist. I'm almost out of time, but the last point that I will address quickly, and I feel compelled to because when I read the reply brief when I was coming back from Boston and McLean, I didn't realize that I was called a liar in terms of the question about Mr. Julian about ruining his business. The relevance of that question was very clear, and Judge Matz hit it square on, is that it is relevant to increase statutory damages. At that point, there had been no election made. That was going to be my question. Was no election made at the time of that question? No, not at all. And statutory damages under the Copyright Act are a form of punitive damages. And in California, the financial condition of the defendant is always going to be what we're talking about, punitive damages. The case site for, in the Ninth Circuit, that statutory damages are punitive in nature is Nintendo of America, Inc. v. Dragon Pacific International, 40F3rd, 1007, page 1011, Ninth Circuit, 1994. So that was relevant. And even if it wasn't relevant, it was harmless there. We had so much other evidence on the record that the jury couldn't come to the same conclusion. The guy was struggling. He had, you know, a million dollars worth of sales. He had a $225,000 loan out. He had to take half his salary because he said in order to stay in business, I had to take a cut in my salary. So there was plenty of evidence where the jury would have reached the same conclusion, and certainly plenty of evidence to support the verdict that was rendered by the jury. It was a very careful, methodical award that the jury made. I'm going to turn it over to Mr. McClellan at this point, unless you have any questions. May it please the Court. Aaron McClellan, Murphy, Pearson, Bradley, and Cini on behalf of Appellee Barclay-Butera. Addressing in turn, since I have a short period of time, some of the comments of Mr. Sonny with regard to confusion and surprise, Mr. Butera was not only deposed in what turned out to be more than six weeks before the actual trial commenced, but two additional employees of his were deposed, all at our expense and at his convenience, at which time documentary evidence regarding finances were given. And more importantly, the documentary evidence of finances demonstrated a decline in sales in the months following the auction. Not only that, during the auction, Mr. Butera was deprived of his ability to conduct business with premises, paid $20,000 to be in the catalog, along with numerous other sponsors, and did not receive any direct financial benefit. On that point of direct financial benefit, that is the standard within the Ninth Circuit. It's the standard enunciated in the Perfect Ten case. And it's and it's a it's a real stretch by the appellant to have attempted to extend. With regard to the U-Haul case cited by Mr. Sonny, I will note in that case a strong distinction. There was expert evidence presented and survey data presented regarding the sales and profits of U-Haul that resulted as a result of their advertising. Accordingly, and it was noted by the trial court in this case that Mr. Sonny, despite having every opportunity, neither disclosed any expert witnesses, nor introduced any of the financial evidence that was provided to him by the Butera defendant,  Additionally, with regard to the vicarious liability issue, there must be a causal relationship between any profits and the infringing activity in order to establish vicarious liability. Here, there was nothing, no evidence elicited, no witness, no declaration, no evidence that any conduct related to the infringing activity, which was a small part of a large auction of the actual physical Marilyn Monroe items, resulted in a single sale or an additional customer showing up. There were no interviews. There was no survey data. So I believe that the record speaks, an evidentiary record speaks to that. Counsel, were you going to address jury instruction 3G? Your Honor, that is exactly what I have started to do with regard to the direct profit requirement. So 3G actually quotes directly from the Grokster case. And at the time, Judge Matz was on the committee reforming and instituting the new model jury instructions. And my reading of that jury instruction now is almost a mirror reading of the instruction that he decided to put forward in this case. Counsel, I had asked opposing counsel whether or not he objected to this instruction. I was a little confused because I was looking at X of the record 1802 where the disputed instructions were discussed and there was no reference to the derivative liability instruction. Then I was looking at ER 1212 through 1217 where the agreed instructions were included and the one for derivative liability was included as an agreed instruction. So is there anywhere else in the record that I can look to see whether or not there was an objection to this instruction? That is the claim that we made in our opposition. And to my understanding, that's correct. I believe that in his reply brief, the appellant indicated that he made objections, but I could not find them. And they may have been in the form of an omnibus objection. I'm not clear on that and I can't answer your question, I'm sorry. Thank you. With regard to the direct financial benefit, I'd like to address the issue that the appellant has argued related to the enhanced prestige as being equivalent to a direct financial benefit. Again, this was this sort of relates to the draw theory that we historically see where a concert hall operator might be able to obtain the direct financial benefit as a result of the sodas they sold or as a result of the profits they made that they were sharing on the gate here. There was nothing for sale at the time of the auction. There was not there was no evidence of any sales made. There was no actually there was no evidence of enhanced prestige at all. There was no survey data taken. And what a lot of this case relates to with regard to both appellees is the speculative nature of the damages. The defendant or the plaintiff, Joshua Green, was the only witness on behalf of the plaintiff. I have alleges incurring $750,000 in attorney's fees, presented one witness and no expert testimony. I'll yield to you to my colleague for the last few minutes. Thank you. Thank you. I'm Barry Malin. I represent, along with Miss Petrini, Julian's. And I want to address Julian's cross appeal on the fee award. Quite candidly, we believe that the fee award here of $340,000 on a case where there was a jury verdict of $34,000 was so excessive and so outrageous that it cried out for review by this court. As the court well knows, attorney's fees under the Copyright Act are discretionary. That means they may be awarded. It also means that sometimes they won't be. Now, here what the district court did is they went through and they said, okay, well, you spent too much time on this or you shouldn't have done this. And they basically stopped in connection with the analysis. And the error, the abuse of discretion here, was in failing to consider the fogarty factors, and in particular, the degree of success obtained, which, as the U.S. Supreme Court in Hensley noted, was the most critical factor. Here we have the fees awarded were ten times the amount of the verdict. The verdict itself was 1 percent of what was requested. Judge Metz actually said it correctly in his order. He said, Plaintiff is entitled to be deemed a prevailing party, but cannot claim to be victorious. The outcome of this case and of the trial was a bust. That's exactly what it was. This circuit in the Hayworth case has indicated that simply having the statutory potential to obtain fees, does not give counsel a license to go to trial, run up the attorney's fees, and then recover them. This was copyright legal and run amok. It was the proverbial tail wagging the dog where the objective was to pay for fees. The award here was an error. It encourages just terrible dispute resolution. It encourages copyright plaintiffs who have cases worth $34,000 to turn down $34,000 settlements or $60,000 settlements or $120,000 settlements to basically use the district court as an attempt to play the lottery. You're arguing that he shouldn't have awarded any fees. Excuse me? You're arguing that he shouldn't have awarded any fees. My argument is really in the alternative. Yes, it was an abusive discretion in this context to award any fees. At a minimum, the fees should have, if there was going to be any fees awarded, it should have bore some type of nexus to the amount of the verdict. I believe that the jury gave the plaintiff 1.2 percent of what the plaintiff asked for. Had Judge Nats in turn, and this is not a hard and fast rule, given the plaintiff 1.2 percent of the $750,000. Let me ask you another question. Yes. Did Judge Nats consider or yes, did he consider the issue of the discretionary nature of fees in a copyright action? Did he realize that he had the discretion not to award any fees? Well, it's — Did you give him a case and make that argument to him? We did. We did. We did at the trial court level. We did argue that, and that was simply not considered at all. None of our arguments about the court having the discretion to award no fees were in the alternative for the fee award to bear some nexus to the outcome at trial in connection with what was requested. That was disregarded by Judge Nats. And, again, the error would be the failure to adequately consider the fogety factors, especially the degree of success obtained. So on that, I'll submit. All right. Thank you, counsel. This case will be submitted. And, Ruth, I'm sorry. You had your allotted time, and you used it. I was going to offer the judge an allowance in the citations you're receiving. Well, write it down in a piece of paper and give it to court. We're adjourned for — the session of this court is adjourned for today. And Melton Green v. Williams Auction House is submitted.
judges: Wardlaw, Rawlinson, Smith N. R.